Good morning. Good morning. Charles Tony Bakuda on behalf of appellant Bradley Rose, if it pleases the court, this is an obvious case of a constitutional violation and excessive force. No objectively reasonable officer in Officer Farney's position would have believed that Bradley Rose posed a significant threat of death or serious bodily injury. Every Graham v. Conner factor that's typically analyzed in these cases cuts in favor of not using lethal force. Officer Farney admits that he appreciated when he was at the scene that Bradley Rose was mentally disturbed, couldn't appreciate what was going on and what was confused, and confused. Yet Officer Farney failed to take any of that into account and reassess the situation and implement that into his calculus as to how he was going to handle the situation. And as this court is well aware, policing is dynamic and officers must always reassess their situation. Counsel, even if we agree with you that there was a constitutional violation, does qualified immunity apply in this case? It does not. Why not? So you have to persuade us that there is clearly established a precedent. And so it would have to be a case that's close to the facts of this case that would put the officer on notice that what he did violated the constitutional rights of the deceased. So what case, what's the closest factual case that you have that would have put the officer on notice that what he did under the circumstance of this case amounted to excessive force? In our briefing, we set forth that this was the obvious case and that Graham v. Conner and Garner would dictate. But then on our briefing again, we recognized that Elder v. Holloway allows the Court and requires this Court to consider all authority. And we set forth several cases. Well, the Supreme Court has told us that we cannot make this decision at a high level of generality, that it has to, we have to look at the facts of similar cases to see because the officer is not able to operate at a high level of generality in the circumstance. He has to look at the circumstances that are unfolding to decide what force to use. So Supreme Court has told us that we have to do the same thing to look at specific facts. If we disagree with you that this is an obvious case, do you lose? No, we don't. And I understand what the Court's mandate was in Casella v. Hughes. But obviously, there's also case law that says you can't use Casella v. Hughes for every novel situation in use of force and excessive force by an officer to allow them qualified immunity. We cited three cases in our brief. It was County v. Hayes, which I know you disagreed with. We also cited Diorle, which sets forth the proposition that you can't use force when it's unwarranted. In doing my research over the weekend of the case of Diorle v. Hughes, I think that's what you just described for Diorle being the holding. You did it at a very high level of generality. And in addition to warning us not to repeatedly use a high level of generality, the Supreme Court specifically called us out for over-reading Diorle specifically in one of its cases. Well, I think you have to take all the cases collectively because there are propositions from every single case when applied clearly establishes that lethal force can't be used in this situation. And you're not going to find cases like this because, simply put, there are a lot of cases where lethal force is warranted and used and it's objectively reasonable. And we can go through those cases. Those are the cases where an individual may be armed and they're not showing their hands to an officer. The officer has a reasonable belief that the person may be armed and they use lethal force. There are the cases where the person is known to be armed or have a weapon or could, and they have their hands where the officer can see them, yet the officer commands them not to move their hands. They move their hands. The officer uses lethal force. It's warranted there. There's the cases where there's a vehicle involved and the officer's life may be in risk. That's Porter v. Osborne. There's other cases where an officer is losing an active combat hand-to-hand situation. They've used less intrusive alternatives, and those have failed. But the key, I mean, one of the key issues is the other side of the ledger, not just what is the collection of cases and the rules supplied by them, but what are the facts to which they're being applied here? And so what do we take as the facts? It's undisputed that he did at least strike the officer once, and then, but he also claims, the officer claims that he reached for the gun. Is that something we have to disbelieve for purposes of summary judgment here? That's correct, Your Honor. That's in dispute as recognized by the district court correctly. And there's several contradictions with respect to Farney's accounting of events with respect to the physical evidence that completely contradict his version of events. Now, what's So then a reasonable trier could just set his version aside as not credible. But then what replaces it? What are the facts that are then established, as you understand them? Taking plaintiff's evidence After the strike, what are the facts that then happen that lead up to the shooting? In your view, what should a reasonable jury conclude, and what do we have to take as true in your view? Well, number one, that there was never a grab for a firearm. That's a major fact in the case that would be in plaintiff's favor. That never occurred, as correctly recognized by the district court. Second, and very importantly, that Farney disengaged to a safe distance at the time that he fired the fatal shots. And by his own testimony, he said he did disengage, and when he disengaged, he then elected to use lethal force. Now, what is very critical about this analysis is that his accounting of the lethal force event, it doesn't square with the physical evidence. Because in his statement given to the investigating detectives, which is Exhibit K in the record, he claims that he took his firearm and fired it from just above his hip at a cannon position upwards. The autopsy report shows all three lethal shots entering from his chest level at a downward trajectory. And so what should a trier infer from that? That one, Officer Farney's accounting of events isn't accurate. And of course, we don't have the body-worn camera, which he elected not to wear, when this occurred. But what, from that trajectory, what is your alternative theory as to where his hands were when he fired the gun that you think the jury should infer from the trajectory evidence? The jury could infer that he was at a safe distance, that he had his arm extended, and that he fired three shots downward into his chest that exited lower in his body, which is what the autopsy shows. So in your view, he had time to raise it up and aim, and there's a few seconds more deliberation? In addition to that, he has time to holster his gun and, yes, use less lethal alternatives. He's armed with a duty baton, a taser. He's taught to take people into custody when there's a physical encounter without shooting them to death. He's trained in defensive tactics, pain compliance techniques. He knows nerves and brachial stunts. He knows all these things, and he has that at his capabilities. And he's not only expected to utilize that, he's required to utilize that before escalating to deadly force. And in addition to that, this is an individual that was not a known criminal. Farney knew he had no wants or warrants. This person's never been arrested. He had no disciplinary issues in high school. He was a computer nerd that was 150 pounds, and you have Farney, who's trained in defensive tactics, who's 220 pounds. At the time of the lethal shooting, he has multiple backup present. He gives zero... Counsel, let me go back to my colleague's questions. In light of all of what you've said, what is the case that that officer should have known of in advance that would have told him not to do what you're criticizing? It's not only an obvious case, but it's Duorle, it's County v. Hayes, it's Newmaker. In addition to that, when I was preparing over the weekend, I know it's not a Ninth Circuit case, but there's a case called Tanuvasa v. Morden. It's Central District of California. It's 2014 Westlaw 12588685. In that particular case, a single officer was pursuing robbery suspects. The officer was 6'1", 180 pounds. A suspect that's 6'6", 400 pounds, hits him, dislocates his shoulder. There's a fight on the ground. His duty weapon goes off. The officer separates four feet. He then shoots him to death. The district court there said that is not a constitutional use of force or that a jury could conclude that and denied qualified immunity. Out of fairness to the court, that case was found over the weekend, and that's why I'm citing it here for the first time. But that is a case in the relevant body of law that the court may consider and should consider pursuant to Elder v. Holloway. But in Rivas-Villegas, the Supreme Court said if the case is materially distinguishable, then it doesn't provide the sort of squarely governing authority that Casella talks about. And something like Durley, I mean, Durley emphasized that it was an unarmed man who had committed no serious offense. I mean, here, at least, he had already committed several very dangerous traffic violations. He had committed a battery on the officer, which, those are serious offenses. So right away, it seems that Durley is materially distinguishable, just on that fact alone. Well, Durley stands for the proposition that when you take an individual who's mentally disturbed into custody, you have to treat them differently than a known violent felon or someone that's committed violent crimes. With respect to Bradley Rose, the crimes that they claim he committed are all mens rea specific intent crimes. The second that Officer Farney confronts Bradley Rose, and by his own testimony, appreciates he doesn't know what's going on, he's staring blankly, and he's completely confused. The calculus changes as to what happened prior. Now, the pursuit that they try to paint as some dangerous, life-threatening pursuit, it wasn't like a normal effort to pull over a motorist. He was driving at 30 to 35 miles per hour. He was driving in ways that didn't make sense. He was pulling over randomly. The officers appreciated that it wasn't normal, so much so that one of the officers said, I believe he's having mental issues. So that's, with respect to Durley, it's for that proposition that this is a different calculus. And like you recognize in the state of Hernandez, when an officer has time, they're supposed to reassess the situation. And like McBride should have reassessed the fifth and sixth shots there, that you found could be excessive, that's what Farney failed to do here. When he steps outside of his vehicle, first of all, he needs to decide what the immediate threat is, and that's Per Andrews. And the immediate threat at that time is nothing. You have Rose standing there, not running, unarmed. This is his testimony. He claims that he gave commands at the top of his lungs and pointed his weapon and approached Bradley Rose walking and giving more commands. He said that in a statement to investigators, he repeated that in the deposition. He did not know at the time he made those statements that video surveillance from a nearby house captured him actually running towards Bradley Rose and contradicting everything he said he did. In addition to all this, everything he did on the night of the incident was contrary to his training. And that's a factor that this court should consider as set forth in Drummond v. City of Anaheim. He didn't put on his body-worn camera, he wasn't recording. He didn't call in his involvement in the police pursuit like he's supposed to do. When he gets to the scene, he says it's a high-risk stop. He's supposed to wait, use his backup, take a cover position, give commands to the individual. He's supposed to also, if the person has a behavioral health disturbance or is mentally disturbed, he's supposed to not speed up the situation. He's supposed to calm things down. He's supposed to talk to the individual. He didn't de-escalate. He gave no deadly force warnings. He did none of these things. Within three or four seconds of being in contact with Bradley Rose, he shot him dead. We have no objective analysis of actually what occurred because he wasn't wearing his body-worn camera. But what is critical is that his body-worn camera, although he wasn't wearing it, started recording in his vehicle because it automatically started recording when a gun was drawn. And what he said is completely proven false by the body-worn camera. He claims he got out of his vehicle and started giving commands at the top of his lungs. His body-worn camera was recording audio. It doesn't capture any of that because it never happened. He's two to three feet from his vehicle and he's giving commands, shouting them as loud as he can. You can't hear it on the body-worn camera. Yet, Officer Schrader, later in that same audio of body-worn camera, from 40 feet away, yells a command that can be picked up and heard on the body-worn camera. So that's one of the major errors in the district court's opinion, is they concluded that commands had been given and conducted their analysis that way. I'd like to reserve just 30 seconds if I could. All right, thank you, counsel. We'll give you a minute for rebuttal. Good morning, your honors. My name is Justin Ackerman, and I represent the defendant, Appalese, in this matter. Your honor, the version of the facts that you just heard involve a retelling of facts that involves a good deal of speculation and simplification. And those aren't my words. Those are the district court's words and its ruling. Plaintiff wants to imagine that this case started when Deputy Farney pulled behind Mr. Rose at the house at McVicar. This case didn't start there. It started eight to 12 minutes earlier when there was a series of events that's uncontested that Mr. Rose was driving erratically. He was endangering the safety of the community and the officers at issue. He was requiring, he was driving so dangerously, he was requiring the officers to jump out of his way as he hit their cars and swerved onto the other side of the road and almost hit other pedestrians and trucks. He put the officers in fear for their life during this pursuit. When he finally stopped at the residence at issue, the officers did not know what he was going to do. They did not know if he was going to go inside that residence and create a hostage. Situation. They did not know as he stood at the door jam of his car what he had in that car. But they did know that this particular individual, regardless of his prior criminal history, which they were also unaware of. And regardless of anything he might have done in the past, was acting erratically and violently that evening. They needed to control somebody who was out of control. And so for those reasons, it is entirely reasonable for officer. You have to have at the moment of shooting, you don't get to shoot him just because he engaged in all the behavior you've just described up to that point. Certainly not. It has to be that it is warranted by the immediate circumstances that preceded. The problem, of course, is that the officer doesn't have his body worn camera on. And so he does not get the benefit of the Scott v. Harris rule that we take the videotape as true and even contrary to sworn things that contradict what's obviously on the videotape. So instead, we have to circumstantially infer what were the facts that he confronted. And what are those facts as you see them viewed in the light most favorable to the plaintiff? Certainly, Your Honor. So I want to start off first and foremost with Officer Farney's sworn testimony. An officer's sworn testimony is evidence in the record that must be disproven materially. Well, no, that's not necessarily true, because we're supposed to take the facts in the light most favorable to the plaintiff. And so if that testimony contradicts the plaintiff's, what's favorable to the plaintiff, then we don't take that testimony. I would disagree with that, Your Honor, because just because an officer gives sworn testimony doesn't mean it's automatically disproven because we interpret the facts in light most favorable to the plaintiff. You may be right in the sense that there has to be a basis in the record on which a jury could reasonably discredit it. But he's pointed out three things. You know, Farney said that he walked. The video from the neighbor shows that he ran. Farney said that he shot it from his hip. The trajectory evidence from the autopsy shows that the bullet went downward, which shows that that wasn't true. He claimed that he was shouting commands. The body-worn camera that was left in the car, which should have recorded those, didn't. Those are three things that a jury could latch on to to say this guy is a liar, and I reject all of it. And so now with that taken as true, what do you have as the facts that he confronted at the scene? They aren't material facts, Your Honor, and here's why. One … No, no, no. Those facts themselves don't have to be material, but they provide a jury a basis, a circumstantial basis to say I think the officer is a liar, and therefore, when he claims he was reaching for the gun, I don't believe that. And therefore, we, reviewing a summary judgment record, have to take as true that he wasn't reaching for the gun. Your Honor, I go back to there must be a dispute of material fact in the record. And in that regard, there is not a dispute of material fact. The facts admitted are that he was punched by him when he went to go arrest him. He was struck by him as a uniformed police officer. That is an aggression that is unjustified and entirely improper. Correct. But then he does admittedly put some space between himself and Mr. Rose. And then what do we have as the facts? What you have, Your Honor, and this is the testimony of the other two officers on scene, is that they are engaged in an active fight. Plaintiff will only admit there was a singular strike, but he has no basis to argue there weren't more. The other officers on scene all testified that he was being struck multiple times in the head, the shoulder, the chest, and post-accident photos show bruising on both sides of his face. You can't punch somebody once and only bruise both sides of the face. It's physically impossible. He was in an active fight with him, and there was a grab on the gun. Again, they have no evidence to affirmatively demonstrate that there wasn't the grab. There was fingerprint evidence that corroborated his account that there was a grab on the gun. What was the fingerprint evidence? Was Mr. Rose's fingerprints on the gun? The fingerprint analysis showed that there were partial prints on the gun. There could be no affirmative match because they were partial. But it corroborates his account that there was some other evidence that shows that his gun was grabbed. It doesn't disprove his account either. That only supports it. And in that regard, the autopsy report is entirely improper. Plaintiff does not have an expert to link up the ballistics here. And this Court in Smith v. Agdeka, and I'm sure I'm butchering the name, clearly said you need an expert to link that up. Otherwise, it is simply argument of counsel. There is no expert in this record that supports plaintiff's argument here that the ballistics as they argue it somehow contradicts materially Deputy Farney's account. And in addition to that, even assuming there was some sort of angular argument, it says nothing about whether there was a grab right before the shooting. It just describes the shooting. And that's not a material fact in that regard. And so all this Court is left with is Deputy Farney's testimony that there were grabs on the weapon, sworn testimony, and corroborating evidence in the record between the fingerprint evidence and, quite frankly, the conduct that occurred right beforehand. He was just assaulted. He was assaulted multiple times. This person was driving erratically. This person was behaving incredibly violent. This is all consistent with his account. And his account was consistent the entire time, from the time that his post-accident testimony was taken with regard to the grab all the way through the case. And so for those reasons, I don't think the grab is in any way materially disputed and is entirely a basis for the Court to rely on it. It's the reason why the Court, again, reiterated the retelling of facts involves a good deal of speculation and simplification. Sotomayor, what's your definition of material fact? It's a fact that actually goes to the heart of the case, Your Honor, that actually matters in terms of whether or not the use of force was justified. And, of course, we get back to the case law in that regard. Well, isn't everything that happened leading up to the use of force, wouldn't all of that be material? I think in order to justify use of deadly force, you have to look at threat of grievous bodily harm or injury. And that's the focus here. So whether there was commands or not honestly isn't material in this instance because we're looking at so whether he posed a serious threat of bodily harm. I don't know that that's true because whether or not there were commands or not would help us decide whether or not the use of force was reasonable. If somebody is disobeying a command, that's one scenario. But if no command was given, that's a different scenario. So I don't know if I agree with you that that's immaterial. Well, at that point, this Court would be basically weighing the facts as to whose testimony is appropriate. No, we're weighing the facts. We don't weigh the facts. We consider the facts in the light most favorable to the plaintiff. That's the difficulty. Sometimes you're asking us to weigh the facts, and that's not our role. Our role is to look at all the facts in the light most favorable to the plaintiff. And when you focus on the testimony of the officers, that takes away from viewing the facts in the light most favorable to the plaintiff. I guess my frustration or difficulty is that there must be a fact to weigh in the light most favorable to the plaintiff, and here there aren't facts. Well, because the plaintiff isn't here. That's correct, Your Honor. And that's the difficulty that we've recognized, that when the plaintiff has been killed, then we have to look at the facts. You know, we look at a kind of, you know, side-eye, because the plaintiff isn't here to give his version of events. And what I'll offer, Your Honor, is when this — when that is the case, as it is here, it's — the case is Cruz v. City Anaheim. It says this Court looks to whether there's corroborating evidence in the record. And that's what I just put forth to this Court. There is corroborating evidence in the record. So — But as Judge Collins pointed out, there's also some evidence that may call into question the testimony of the officer. And my rebuttal to that would be based simply on the argument of counsel and not actual facts in the record. I'll move on to qualified immunity, because I think the Court can decide it on that. It's how the trial court decided it. DeRolle, Hayes, and Newmiker are all entirely distinguishable. DeRolle involved an issue where police officers were on scene for 40 minutes. They had 12 officers there. They had entirely barricaded the entire house. They were waiting for emergency services to come to try and negotiate with this person who's behaving erratically. They knew and had control of the entire situation. There was no prior chase. There was no immediate need for use of force in a 7- to 10-second span. It is entirely distinguishable. Hayes — The officer was not wearing his body cam. Your Honor, I believe what the record shows is at the time that Deputy Farney engaged in the pursuit, he was charging his body camera at the seat of his — at the seat of his passenger side of his car. And during the pursuit and in the immediacy of everything, I just don't think he had the opportunity to put it on himself. And so there's — to the extent that there's any inference of intent or intentional not putting the body cam on, it's simply a circumstance of how these things played out. He was in a banded parking lot doing some reports that night as Deputy Godfrey drove by him with his sirens on, and they all engaged from there. Do you disagree with the premise that if commands had been given, the body cam audio would have picked them up? Do you disagree with that? I do disagree with that, Your Honor. I believe just because the body cam didn't pick it up didn't mean it didn't happen. And here's why. Excuse me. The body camera is on the passenger floor of his car. The door is closed. He's on the driver's side of the car, and he's moving away from it. You know, they make a lot about Deputy Schrader being able to be heard on the camera, but she's on that side of the car as she's giving commands. And so there is — there is an explanation, I would submit to the Court, as to why it's difficult if not — if not impossible to hear Deputy Farney's commands. Is that construed in the light most favorable to the pointer? Well, Your Honor, Deputy Schrader also testified that she heard the commands. So again, it's just argument of counsel that it didn't happen. Deputy Schrader said, I gave my own commands, which is undisputed in the record. And she said, I also heard Farney giving commands. That's the testimony in the record about commands. You know, I'll go back to the cases, because I think that's the important piece here for purposes of qualified immunity. Hayes involved an officer arriving to a domestic dispute issue. He finds somebody in the kitchen with a knife. He sees the knife. He immediately shoots. That's not this case either. There's no punch. There's no fight. There's no — it was an immediate shooting without any warning. And so for that reason, Hayes is an opposite as well. There was no prior chase. There was no knowledge base to let the officers know, this person is a threat to the community and he needs to be controlled immediately. And any slight movement, I need to shoot this person. Do you agree that on this record, a reasonable jury could conclude that after the flailing and the multiple strikes on Farney, he was able to step back a few feet and disengage? Farney's testimony is that he was able to fight him off the second time he had grabbed his gun, create a little bit of space, and discharge his weapon, Your Honor. And the Billington case, I think, answers that question, because in Billington, there was an argument about that. And counsel had made the argument in that case that, well, because we were able to create space, then the shoot was improper. And the court in Billington flat out rejected that argument. And I would submit to the court, this court asked, what case is on point? Billington is. Billington involved a police chase. It involved an escalation right on foot after the police chase where there was a fight. It involved a grab, and then it was involving a shoot. All same four factors are here. And again, the plaintiff had tried to make a lot of hay out of the fact that there was some distance, four to five feet, I believe, was the testimony in Billington, that made it so that there wasn't the need to shoot because there was that distance, and the court completely and flat out rejected that argument. And so I would submit we're right on par with Billington here. You know, we didn't, counsel didn't get to the other issues in the case. There was certainly no time to deliberate with regard to the Familia Association claim of seven to ten seconds was the shooting. And in that regard, the purpose to harm test applies. The briefing doesn't even make an argument that if purpose to harm applies, that they somehow prevail. And so I think they've conceded that if that standard applies, then the Familia Association claim was properly dismissed. With regard to the handcuffing claim, Deputy Godfrey had handcuffed Rose right after he was shot. And at that point in time, he didn't know who shot who or what was going on. But he did know that there was an active dispute going on, a fight going on between the two. We're looking at Billington, and it says there was a genuine dispute of fact over whether or not they were grappling over the gun, and says this factual dispute is immaterial, however, because either way, Detective Smith was locked in hand-to-hand combat and losing. Are those the facts that we have here? Your Honor, there's clearly hand-to-hand combat going on, and our officer testifying that he was struck so hard he was dazed. And then the next thing he knows, his gun's being pulled from him, and he's fighting for his life. So I think you're absolutely right on point. Sotomayor, I agree. If a jury believes his testimony, you're going to get a defense verdict. But I think we've already explained to you that there is enough in this record for a rational jury to disbelieve portions of his testimony. And so we can't take as true that he was grabbing the gun. And the fingerprint evidence is inconclusive. So, you know, maybe you have, because the other officers also say that he was hit multiple times, but being hit multiple times, that's undisputed. Putting some space, stepping back a few feet, that's undisputed. Not enough to justify a lethal shot. You need something more, but the something more is Varney's testimony, which a jury doesn't have to believe. So I, you know, it's hard to see how this doesn't have to go to trial. Your Honor, if all that's in the record is Varney's testimony, that's the only fact in the record. But irrespective, Plaintiff's counsel still hasn't demonstrated that there is a sufficiently similar case on point. And I know this Court, you in particular, Your Honor, has made a big point in the Cortes Luna case about how there needs to be specificity in the record on an equally specific case that demonstrates to this officer and every other officer in the universe of officers that what happened here would have been a constitutional violation, and there isn't a case that is sufficiently factually similar. And that's what Plaintiff's counsel is required to provide to this Court, and he's failed to do so. All right. Thank you, Counsel. Any questions? Rebuttal? Let's give one minute. I'll just be as brief as possible. There's a couple things that he said that are completely inaccurate. The first thing is, Varney's given a wildly different version of events with respect to what he told Lake Havasu City Police versus what he said in his deposition. When he gave his statement to police, he claimed that as soon as he approached Bradley Rose, Bradley Rose grabbed his gun and then struck him. When he gave his deposition testimony, he claimed the first thing that happened was Bradley Rose struck him, and then there was a pull on his arm, not even a grab for the  In addition to that, what they're trying to paint as a violent attack with respect to the injuries, Varney testified himself that he was struck once. Deputy Schrader said it was a flailing of arms. In her statement given to Lake Havasu City Police, she said she saw a right swing and a left swing and then pew, pew, pew. She didn't say she saw a struggle for the gun. She didn't even say that she saw any strikes landing. With respect to the body of the officer referring to there, Schrader, with respect to the body-worn camera, Officer Godfrey, who comes on the scene, she, she, Schrader testified that she saw strikes hit Varney. Right, but when she gave her statement to Lake Havasu Police investigators immediately after it occurred, she didn't say that. She only said that after having a chance to prepare for the case and meet with her counsel. And then, with respect to the fingerprint evidence, they're laden fingerprints. They don't know who those could be. Those could be Varney's. No one could get any prints off of what was on the gun. So that actually cuts in Rose's favor. Also, the officers there didn't see the struggle for the gun that they allegedly say occurred. Finally, the injuries are inconsistent. They claim that there was bruising on both sides of his face. Varney never said that. When he was questioned by investigators, he said he was struck once and he pointed to a nick on the side of his face that would probably be consistent with like a fingernail scrape. And if you look at the statement he gave to Lake Havasu City investigators, that's the only injury he discusses or says he sustained. And finally, with Smith versus Agdepa, there the court had no use for the trajectories because there was no way to link them up to the positioning of, to the officers at the time. Here, the physical evidence that exists are downward trajectories and Farney's statement is they were all candid upwards. So it's actually physically impossible for it to have occurred like Farney said. And that's not argument. That's objective evidence. And then- All right, thank you, counsel. Any questions? Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court.
judges: RAWLINSON, COLLINS, Fitzwater